UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
AT COOKEVILLE

| | |
|---|---|
| AUI MANAGEMENT, LLC, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | No. 2:11-cv-0121 |
| v. ) | |
| ) | Judge Sharp |
| UNITED STATES DEPARTMENT ) | Magistrate Judge Griffin |
| OF AGRICULTURE, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM

The United States of America, on behalf of Defendants United States Department of Agriculture ("USDA"), Farm Service Agency ("FSA"), and Bruce Nelson ("Nelson") (collectively, "Defendants") filed a *Motion to Dismiss for Lack of Jurisdiction* (Docket Entry No. 41), to which Plaintiffs AUI Management, LLC ("AUI") and Jeff Callahan ("Callahan") (collectively, "Plaintiffs") filed a response (Docket Entry No. 43), and Defendants filed a reply (Docket Entry No. 45). For the reasons discussed herein, the Court will deny Defendants' motion.

**RELEVANT PROCEDURAL HISTORY AND FACTUAL BACKGROUND**

Plaintiff Callahan is an individual resident of Putnam County, Tennessee and is the President and owner of AUI, a limited liability company.[1] AUI, was the management company for Advocacy Resources Corporation ("ARC"), a non-profit entity that participated in a federal government set-aside program geared toward the employment of disabled individuals and the provision of certain products to government agencies ("Government Supply Contracts").

---

[1] Unless otherwise noted, the allegations are drawn from Plaintiffs' Amended Complaint (Docket Entry No. 39).

1

Defendant USDA is an agency of the United States Government, and Defendant FSA is a division of the USDA. Defendant Nelson is the Administrator of the FSA and was the Suspending Official in this matter.

ARC was in the business of fortifying vegetable oil with Vitamin A for use in Government Supply Contracts for domestic and export programs, generating $30-$50 million per year in gross revenue. ARC's primary customer was the United States Government. ARC operated primarily under contracts designated for nonprofit companies under the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. §§ 46-48c. JWOD (now known as AbilityOne) was created to provide set-aside business for the benefit of nonprofit agencies that employ blind and disabled individuals for 75 percent or more of their direct labor. ARC supplied 20 percent of vegetable oil bought by the USDA for various government programs.

The legislation that governs the AbilityOne program includes a process for a separate Government committee to handle certain duties. JWOD required the establishment of the Committee for Purchase From People Who Are Blind or Severely Disabled (the "Committee") to administer the set aside of products and services for purchase from nonprofit agencies. The Committee's responsibilities include establishing a procurement list for commodities and services suitable for procurement from qualified non-profit agencies for the blind or severely disabled and determining a "fair market price" of commodities and services on the procurement list in accordance with the provisions of the AbilityOne legislation.

Despite the Committee's charge to ensure fair pricing, under contract prices set by the Committee, USDA had underpaid ARC for oil since at least 2005, costing ARC several million dollars by 2006, and resulting in ARC's filing a Chapter 11 bankruptcy petition on June 20, 2006. Michael Collins, an attorney and financial restructuring specialist, was appointed trustee of a

liquidating trust for the benefit of ARC's prepetition creditors. He also became a member of ARC's board of directors pursuant to its bankruptcy reorganization. While in bankruptcy, the underpayments continued resulting in an underpayment claim totaling approximately $13.4 million through 2011. As a result, ARC's poor financial position deteriorated precipitously. By late 2006, ARC had a large negative net worth and could not continue as a going concern. It faced imminent failure and liquidation.

ARC was within days of being liquidated when the trustee, lacking non-profit financing options, approached AUI and Callahan to provide financing and management expertise to help restart ARC. As collateral, AUI would receive a first priority secured position on any post-bankruptcy petition assets of ARC, instead of the customary first position on pre- and post-filing assets, which would have provided a larger asset pool. Because ARC was a not-for-profit company having no stock certificates or shares, it could not pledge any stock as additional security. Despite the high level of risk, AUI and Callahan were willing to accept the terms that the trustee offered, terms that had been rejected by other potential sources of financing. Callahan personally guaranteed all of the funds provided to ARC.

A financing arrangement was approved by the Bankruptcy Court on November 22, 2006, that allowed AUI a management fee for its role. The agreement was subject to Bankruptcy Court oversight and included a provision indemnifying and holding AUI harmless from any claims resulting from any negligence or willful misconduct by ARC. In accordance with the Management Agreement, AUI provided accounting and management personnel as well as millions of dollars in financing for inventory and equipment. Callahan served in a "big picture" strategic role and delegated the day-to-day operational authority to others.

In late August or early September of 2009, Robert Buxton ("Buxton"), a USDA contracting officer involved with the ARC contracts, was contacted by Lanelle Step ("Step"), a USDA auditor with the Warehouse Licensing Examination Division. She faxed a number of Certificates of Analysis ("COAs") that had been issued by the Barrow Agee testing lab in connection with ARC vegetable oil. COAs are the means by which the Government determined that the oil met government standards for Vitamin A fortification. Buxton compared the Barrow Agee COAs with the COAs that had been included in several ARC invoice packages. Buxton found that there was one difference between the Barrow Agee original data on the COAs and the data on the ARC versions submitted with the invoice packages – the percentage content of Vitamin A had been altered.

The decision was made by the USDA to report the matter to the USDA Office of Inspector General ["OIG"]. Although there was enough information available from the initial review of records to see that multiple COAs were involved, likely affecting shipments of at least $375,000, the decision was made not to contact ARC, AUI, or Callahan, or advise any of them of the issue. Neither AUI nor Callahan was aware of the issue or had any reason to suspect any problem with the COAs.

On September 16, 2009, the USDA, with a number of its agents involved, executed a search warrant on the facilities of ARC in Cookeville, Tennessee. Shortly after the search warrant was executed, ARC contacted counsel for assistance. ARC's counsel contacted the U.S. Attorney's office and informed Assistant U.S. Attorney Ty Howard ("Howard") that he would be conducting an internal investigation. ARC's counsel took steps to assure that records were preserved and that ARC cooperated fully with the Government.

ARC interviewed a number of employees and reviewed other material and came to the conclusion that Richard Foster ("Foster") had acted alone in connection with the COA falsification and that he was simply a rogue employee. Foster resigned within days after the search warrant was executed, and he admitted his improper conduct to the federal authorities and subsequently to ARC's counsel. Based on the investigation conducted by ARC, there was no credible information that anyone other than Foster was involved in the falsification of the records. Foster was an employee of ARC and was not affiliated with AUI or Callahan in any manner.

From September of 2009 to 2011, ARC, while still under the direction of AUI and Callahan, shipped to the government $80 million to $90 million of vegetable oil. Although on a few occasions the testing process resulted in remixing to correct variations from the required specifications before shipments occurred, there is nothing in the record to indicate that there has ever been a shipment received by the Government that was out of spec since September 2009.

ARC, AUI and Callahan were suspended from the Government Supply Contracts on May 18, 2011, based on actions of a rogue employee of ARC, unknown to and hidden from AUI and Callahan, which occurred approximately two years prior to the suspension. The only basis in the suspension letter for suspending AUI and Callahan was that the Government alleged they "knew or should have known" of ARC's misconduct. ARC, along with AUI and Callahan, immediately sought review by Nelson. Subsequently, ARC provided written information and participated in a telephonic meeting with Nelson. After determining that a hearing was appropriate, Nelson appointed a USDA employee, G. Sean O'Neill ("O'Neill" or the "Hearing Officer"), to conduct the hearing on the appeal and the parties engaged in a day-long hearing on July 7, 2011.

After the hearing, Nelson proceeded to uphold his original ARC decision anyway, and subsequently, the suspensions of AUI and Callahan – that they "knew of or had reason to know of, the fraudulent activity of ARC." With regard to the falsification, ARC, AUI and Callahan have never disputed that it occurred. However, the falsification of those records ended nearly two years prior to the suspensions.

The impact of these suspensions on AUI and Callahan, as well as ARC, has been devastating. Callahan has been forced to file a Chapter 11 bankruptcy petition. AUI's business operations have been shut down and all of its employees have been laid off. ARC, despite it eventually settling with the Government, was unable to find alternative financing to AUI and has ceased business operations.[2]

Plaintiffs have lost not only substantial revenue from AUI's existing management agreement with ARC, but any realistic possibility of managing or otherwise obtaining any other Government Supply Contracts in the future. Additionally, AUI and Callahan are being prejudiced in efforts to obtain state and local governmental contracts, many of which require bidders to detail any prior suspensions from federal contracts. AUI and Callahan depend on government contracts at all levels of government, federal, state, and local, for most of their income. The suspension, while nominally "temporary," was essentially a permanent death blow to most of the business of Plaintiffs, effectively rendering them "pariahs" with respect to other contracting possibilities. Although the suspension expired on May 18, 2012, AUI and Callahan are now listed in the public archives of the federal Excluded Parties List System ("EPLS") as

---

[2] ARC filed a separate federal lawsuit against Defendants on September 13, 2011, seeking preliminary and permanent injunctive relief to lift the suspension. The Court denied the preliminary injunction, and the parties ultimately filed a joint stipulation of dismissal. *See generally Advocacy & Resources Corp. v. United States Department of Agriculture*, No. 2:11-cv-0097.

previously having been suspended from government contracting for "cause" (Code B). EPLS specifically describes the consequences of a suspension for "cause" under Code B as follows:

> Suspension by an agency pending completion of investigation or legal proceedings pursuant to FAR 9.407-2 . . . and based on (a) an indictment for, or adequate evidence of, the commission of fraud, antitrust violations, embezzlement, theft, forgery, bribery, false statements, or other offenses indicating a lack of business integrity; or (b) adequate evidence of any other cause of a serious and compelling nature. . . .
>
> **Treatment**
> Same as Code A [debarment], except that suspensions are temporary actions. Therefore, the termination date will be listed as "Indefinite" (Indef.). NOTE: Debarment and suspension actions taken in accordance with policies and procedures set forth in the FAR 9.4 are effective throughout the Executive Branch. Debarment and suspension actions taken in accordance with GPO Instructions 110.11A and 39 CFR 601.113 are effective only within GPO or the PS as listed preceding the listed party. These actions are for information purposes only, but should be considered by contracting officials as reflecting acts or circumstances which may have a bearing on the contractor's responsibility, and which may serve as a basis for Government wide debarment or suspension of the contractor by another agency.

Ultimately, Callahan and any entity with which he is affiliated, including but not limited to AUI, no longer meet the net worth requirements for bidding on a wide variety of federal, state, and local government contracts. Prior to the suspension, AUI, LLC, an underground inspection company owned by Callahan, intended to bid on new contracts with existing customers in Atlanta, Georgia; Ocala, Florida; and West Palm Beach, Florida. AUI, LLC also intended to bid on new contracts in Lexington, Kentucky; Lenoir City, Tennessee; and Fort Campbell, Kentucky. For any contract on which AUI, LLC and Callahan desire to bid, they will be required to disclose that Callahan has previously been suspended for cause, and the contracting officials for each contract will consider their suspension as "reflecting acts or circumstances which may have a bearing on the contractor's responsibility, and which may serve as a basis for Government wide debarment or suspension of the contractor." As a result, AUI, LLC has been

unable to bid on these contracts and Callahan has been damaged due to his inability to bid on these contracts. AUI, LLC, has also contracted with state governments in Tennessee, Georgia, Alabama, Florida, North Carolina, South Carolina, and Mississippi for underground inspection services, and Callahan has lost the ability to bid on these contracts as well. At the time of the suspension, Mill Creek Brands, LLC, another entity owned by Callahan, was seeking contracting work with the State of Tennessee Department of Correction, it is now unable to seek this work, resulting in ongoing damage to Callahan. Consequently and in addition to the foregoing, AUI and Callahan's reputations have been damaged by the suspensions.

## **ANALYSIS**

This action seeks judicial review of a government-wide administrative suspension of Plaintiffs from contracting by Defendant Nelson acting as the Suspending Official pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 701-706,[3] and a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202 that the suspension was unlawfully imposed and is void *ab initio*. *See* (Docket Entry No. 39, Amended Complaint at ¶ 6). Plaintiffs contend Defendants acted arbitrarily and capriciously in suspending AUI and Callahan and ultimately upholding the suspension decision on appeal. (*Id*. at ¶¶ 95-96).

Defendants filed their Motion to Dismiss contending this Court lacks subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Defendants argue "[t]he suspensions have been terminated, however, and [] Plaintiffs are free to bid on any public

---

[3] In a case brought under the Administrative Procedure Act ("APA"), the district court reviews the administrative record to determine whether the suspension decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "The arbitrary or capricious standard is the least demanding review of an administrative action. If there is any evidence to support the agency's decision, the agency's determination is not arbitrary or capricious." *Kroger Co. v. Reg'l Airport Auth. Of Louisville and Jefferson*, 286 F.3d 382, 389 (6th Cir. 2002) (internal citations omitted). The APA requires a district court to review "the whole record or those parts of it cited by a party." 5 U.S.C. § 706.

contracts[;] [t]hus the Amended Complaint presents no actual case or controversy to adjudicate and must be dismissed."[4] (Docket Entry No. 41 at 1). Specifically, Defendants contend the claims presented in the Amended Complaint are moot and Plaintiffs lack standing as to any such claims. (Docket Entry No. 45 at 1).

I. **Standard of Review for Motion to Dismiss**

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a defendant may raise as a defense the lack of subject matter jurisdiction. Such a defense "can challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 2014 WL 1978242, at *6 (6th Cir. May 16, 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994)).

If the motion attacks the face of the complaint, the plaintiff's burden "is not onerous." *Cline v. U.S.*, 2014 WL 4667118 at *4 (M.D. Tenn. Sept. 18, 2014) (citing *Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1248 (6th Cir. 1996)). The plaintiff need only demonstrate that the complaint alleges a "substantial" federal claim, meaning that prior decisions do not inescapably render the claim frivolous. *Id*. A court evaluating a facial attack must consider the allegations of fact in the complaint to be true. *Jones v. City of Lakeland*, 175 F.3d 410, 413 (6th Cir. 1999). Thus, "the plaintiff can survive the motion by showing any arguable basis in law for the claim made." *Musson Theatrical*, 89 F.3d at 1248.

Here, Defendants are making a facial attack. As such, the Court will review Plaintiff's Complaint in a light most favorable to Plaintiff, accept as true all of his well-plead factual allegations, and consider whether Plaintiff can prove any set of facts supporting his claims that

---

[4] Plaintiffs agree that the suspensions have been expired, but stress that they are "still listed on the public archives of the Government's Excluded Parties List System ("EPLS") as previously having been suspended …," and as a result, there is ongoing harm to them. (Docket Entry No. 43 at 3, 8).

would entitle him to relief. *Jones v. City of Lakeland, Tenn.*, 224 F.3d 518, 520 (6th Cir. 2000); *Ludwig v. Bd. of Trs. of Ferris State Univ.*, 123 F.3d 404, 408 (6th Cir. 1997).

**II.    Application of Law**

Article III of the Constitution limits this court's jurisdiction to "cases" or "controversies" and encompasses the jurisdictional doctrine of mootness and standing. U.S. Const. art. III, § 2, cl. 1; *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 529 U.S. 167, 189 (2000). "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Supreme Court has defined standing generally as "the question of ... whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Thus, "[t]o satisfy Article III's standing requirements, a plaintiff must show: (1) he has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Cleveland Branch, NAACP v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001). Each element is "an indispensable part of the plaintiff's case" and "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan*, 504 U.S. at 560. Reputational harm can confer standing. *Meese v. Keene*, 481 U.S. 465, 476 (1987).

Standing to sue is determined "as of the time the complaint is filed." *Cleveland Branch*, 263 F.3d at 524. However, even if a plaintiff has standing to bring a suit, the suit may be dismissed at any time for "mootness." This concept has been describe by the Supreme Court as "'the doctrine of standing set in a time frame: The requisite personal interest that must exist at

the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, n. 22, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997) (quoting *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)).

"Mootness occurs 'when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Midwest Media Property, L.L.C. v. Symmes Tp., Ohio*, 503 F.3d 456, 460 (6th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). Therefore, "[e]ven when an action presents a live case or controversy at the time of filing, subsequent developments ... may moot the case." *Id.* at 461 (quoting *Hall v. Beals*, 396 U.S. 45, 48, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969)). "The mootness inquiry must be made at every stage of a case," and "[i]n analyzing issues of mootness it is helpful to keep in mind that '[t]hese problems often require a highly individualistic, and usually intuitive, appraisal of the facts of each case." *Gottfried v. Medical Planning Services, Inc.*, 280 F.3d 684, 691 (6th Cir. 2002) (quoting *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997)).

Defendants argue that "[b]ecause the suspensions have been terminated, this case presents no actual case or controversy and must be dismissed." (Docket Entry No. 41 at 9). Defendants continue, "Plaintiffs' sole count [for a declaratory judgment] in the Amended Complaint is moot . . . [and] a declaratory judgment will not improve Callahan's or AUI's alleged financial problems . . . [n]or can Plaintiffs demonstrate a substantial likelihood that declaratory relief would affect their future rights." (*Id.* at 10).

Defendants direct the Court to two recent district court opinions, which addressed standing and mootness in the context of expired debarments, *Hickey v. Chadwick*, 649 F.Supp.2d

770 (S.D. Ohio 2009) (holding plaintiff's past debarments would be directly related to their ability to be awarded future contracts, because contracting officers are required to consider contractors' performance records when assessing present responsibility; therefore, plaintiff's allegations were reasonably definite to sustain standing) and *O'gilvie v. Corporation for National Community Service*, 802 F.Supp.2d 77 (D.D.C. 2011) (holding plaintiff lacked standing to assert injury to his reputation resulting from debarment action because the debarment expired before suit was filed, his claims were conclusory, and his claims asserted harmful action from third parties not before the court). Defendants purport, "[w]hile [Plaintiffs] may have derived significant revenue from their four-year management of ARC, they have not historically derived their income from federal contracting [−] [i]ndeed, they do not allege to have ever contracted with the United States, nor do they allege any specific intent to do so." (Docket Entry No. 41 at 15). Furthermore, in contrast to both *Hickey* and *O'gilvie*, Plaintiffs were suspended, not debarred. (*Id.*).[5] Thus, according to Defendants, while a contracting official "*may* consider a prior debarment in making an award decision should not confer standing, *contra Hickey*, a contracting officer *may not* decline to award a federal contract based merely on a past, terminated suspension." (*Id.*) (emphasis in original). Defendants therefore claim the terminated suspensions do not constitute an ongoing, actual injury to Plaintiffs' reputations. In another contrast to *Hickey*, Defendants argue, Plaintiffs do not "dispute the fraud occurred on their watch." (*Id.*).

---

[5] Debarment is a punitive measure that an agency may impose only upon a conviction of civil judgment for certain violations of law or based on a preponderance of the evidence of certain kinds of conduct. 48 C.F.R. 9.406-2. A suspension, on the other hand, cannot be imposed as punishment, but may be imposed, pending completion of an investigation or commencement of legal proceedings, upon "adequate evidence" of wrongdoing when necessary to government's interests. 48 C.F.R. 9.407-1(b)(1). (*Id.*).

Plaintiffs assert that Defendants have "constructed an elaborate Catch-22," wherein Plaintiffs "would literally have no legal remedy for being wrongfully and unlawfully suspended by the Government" from federal contracting opportunities and the ongoing harm resulting from their suspension. (Docket Entry No. 43 at 1-2). Plaintiffs contend that although "*Hickey* was a debarment case, the same rationale applies to suspensions since similar substantive criteria apply to suspensions as to debarments in this context."[6] (Docket Entry No. 43 at 13). In contrast, Plaintiffs insist "[e]ach of the factors the *O'Gilvie* court found lacking is present in this action."[7] (*Id*. at 15). Here, Plaintiffs assert in the Amended Complaint:

> 91. AUI and Callahan have lost not only substantial revenue from AUI's existing management agreement with ARC, but any realistic possibility of managing or otherwise obtaining any other Government Supply Contracts into the future. Additionally, AUI and Callahan are being prejudiced in efforts to obtain state and local governmental contracts, many of which require bidders to detail any prior suspensions from federal contracts. AUI and Callahan depend on government contracts at all levels of government, federal, state, and local, for most of their income. The suspension, while nominally "temporary," was essentially a permanent death blow to most of the business of AUI and Callahan, effectively rendering them pariahs with respect to other contracting possibilities.
>
> ***
>
> 93. AUI and Callahan are suffering actual injury as a result of their wrongful suspension and have a significant likelihood of suffering future harm. Specifically:
>
> (a) As a result of Mr. Callahan's bankruptcy, Mr. Callahan and any entity with which he is affiliated, including but not limited to AUI, no longer meet the net worth requirements for bidding on a wide variety of federal, state, and local government contracts.

---

[6] Plaintiffs compare 48 C.F.R. 9.406-2 (causes for debarment) with 48 C.F.R. 9.407-2 (causes for suspension). (*Id.*).

[7] The court in *O'Gilvie* found the plaintiff had not alleged (1) he had applied for any government contracts or had present plans to apply in the near future, (2) he historically made his living through government contracting, nor (3) his debarment would be a factor in determining his eligibility if he ever did apply. *O'Gilvie*, 802 F.Supp.2d at 82.

(b) Prior to the suspension, AUI, LLC, an underground inspection company owned by Callahan, intended to bid on new contracts with existing customers in Atlanta, Georgia; Ocala, Florida; and West Palm Beach, Florida. AUI, LLC also intended to bid on new contracts in Lexington, Kentucky; Lenoir City, Tennessee; and Fort Campbell, Kentucky. For any contract on which AUI, LLC and Callahan desire to bid, they will be required to disclose that Callahan has previously been suspended for cause, and the contracting officials for each contract will consider their suspension as "reflecting acts or circumstances which may have a bearing on the contractor's responsibility, and which may serve as a basis for Government wide debarment or suspension of the contractor." As a result, AUI, LLC has been unable to bid on these contracts and Mr. Callahan has been damaged due to his inability to bid on these contracts.

(c) AUI, LLC, has also contracted with state governments in Tennessee, Georgia, Alabama, Florida, North Carolina, South Carolina, and Mississippi for underground inspection services, and Mr. Callahan has lost the ability to bid on these contracts as well.

(d) At the time of the suspension, Mill Creek Brands, LLC, another entity owned by Jeff Callahan, was seeking contracting work with the State of Tennessee Department of Correction and is now unable to seek this work, resulting in ongoing damage to Mr. Callahan.

(e) Prior to the suspension, AUI, LLC intended to bid on contracts of the State of Tennessee, including but not limited to the Tennessee Department of Transportation ("TDOT"). TDOT rules require the following, under the heading of "General Information:"

> Am I obligated to disclose to the Department information regarding exclusion or circumstances that may constitute cause for debarment?
>
> Yes, the Department's proposals shall require each bidder to state whether or not such bidder or its proposed subcontractors, or any principals of the bidder or its proposed subcontractors—
>
> (a) Have been or currently are suspended, debarred, or otherwise excluded from transacting business with any federal, state, or other governmental authority; . . .

Mr. Callahan has lost the ability to bid on these contracts as well.

(f) AUI, as an affiliate of AUI, LLC, has been prejudiced in its ability to bid on any governmental contracts as a result of the suspension disclosure requirements.

*See* (Amended Complaint at ¶¶ 91, 93(a), 93(b), 93(c), 93(d), 93(e), 93(f)).

The Court finds that this case is more akin to *Hickey* than *O'Gilvie*. As Plaintiffs alleged, they have historically derived substantial revenue from government contracts – and rely on those contracts for most of their income. (Amended Complaint at ¶ 91). And in their own words, the suspensions while only temporary were "essentially a death blow" to their business. Although the suspension has been lifted, Plaintiffs are still listed on the public archives of the Government's Excluded Parties List System as previously having been suspended. Similar to the plaintiffs in *Hickey*, given Plaintiffs history of government contracting, it is likely they will continue to submit contracts in the future and may well be the low bidder on at least some government contracts. *Hickey*, 649 F.Spp.2d at 777. And although the suspensions have been lifted, Plaintiffs are still listed on a public website, which contracting officers are free to view. "Given the large amount of discretion contracting officers are given when making their responsibility determinations," Plaintiffs have sufficiently alleged their ability to bid on numerous government contracts in the future "will be impeded" by the suspensions. *Id.* at 778. Furthermore, any judgment from this Court, that the suspension was void, *ab initio*, (which is the relief Plaintiff is seeking), would likely alleviate such inability and potential harm to Plaintiffs' reputation.

Consequently, the Court finds Plaintiffs' allegations to be reasonably definite to sustain Article III standing, and furthermore, because the Court is satisfied that this case still presents a "live case or controversy," Defendants' motion should be denied.

## CONCLUSION

For all of the reasons stated, Defendants' *Motion to Dismiss for Lack of Jurisdiction* (Docket Entry No. 41) will be denied.

An appropriate Order will be entered.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE